Filed 11/1/21 P. v. Flores CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | B303242 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA141203) |
| v. | |
| FERNANDO FLORES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Roger T. Ito, Judge. Affirmed.

Patricia Ihara, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Defendant and appellant Fernando Flores (defendant) appeals from his convictions of murder, attempted murder, and other felonies. He contends that the trial court improperly excluded evidence of victim intoxication and mental illness, that the court erred in failing to modify jury instruction CALCRIM No. 315, and that prosecutorial misconduct in closing argument denied him a fair trial. Finally, defendant contends that cumulative prejudice from all asserted errors requires reversal. Finding no merit to defendant's contentions, we affirm the judgment.

## BACKGROUND

By information defendant was charged in count 1 with the first degree murder of Alejandro Aguilar, in violation of Penal Code section 187, subdivision (a);[1] in count 2 with the attempted premeditated murder of Jessica Smith,[2] in violation of sections 664 and 187, subdivision (a); in count 3 with assault with a semiautomatic firearm, in violation of section 245, subdivision (b); and in count 4, felon in possession of a firearm, in violation of section 29800, subdivision (a)(1). As to counts 1, 2, and 3, the information alleged that defendant personally used and intentionally discharged a firearm, which caused great bodily

---

[1]     All further statutory references are to the Penal Code, unless otherwise indicated.

[2]     Because Jessica Smith shares a surname with witness Ida Smith, we refer to her as Jessica. After first mention, we refer to other persons by their surnames or occasionally their full names. At trial and in the appellate briefs, both parties have used nicknames for Aguilar and Raul Espinoza throughout. "Titi" is Aguilar; and "Bam" or "Bam Bam" is Espinoza.

2

injury and death within the meaning of sections 12022.7, subdivision (a) and 12022.53, subdivisions (b), (c) and (d). The information also alleged that defendant had been convicted of a prior serious or violent felony making him subject to sentencing under section 667, subdivisions and (b) through (j), and section 1170.12, as well as under section 667, subdivision (a)(1). Finally, pursuant to section 667.5, subdivision (b), it was alleged as to all counts a prior conviction for which defendant had not remained free of prison custody for a period of five years prior to the current charges.

A jury found defendant guilty of all counts as charged in the information and found true all the special allegations.[3] Upon defendant's admission the trial court found true the prior strike conviction.

On November 26, 2019, the trial court sentenced defendant on count 1 to a second strike term of 50 years to life in prison, plus 25 years for the firearm enhancement (§ 12022.53, subd. (d)), and a five-year recidivist enhancement. On count 2, the court imposed a term of life in prison, plus 25 years to life for the firearm enhancement, and a five-year recidivist enhancement. On count 3, the court imposed a three-year term, stayed pursuant to section 654. As to count 4, the court imposed 16 months to be

---

[3] This was defendant's second trial on these charges. During deliberations in the first trial the jury viewed a full video, although only a portion had been admitted into evidence, and sent out a note asking if it could consider both the unadmitted portion as well as the admitted portion. As a result, the trial court granted defendant's mistrial motion. Defendant's second trial began four months later.

served concurrently. The court ordered defendant to pay various fines and fees and awarded custody credits.

Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

In January 2016, Melanie Moreno lived in a complex of about 15 apartments on Pioneer Boulevard in Norwalk where she claims "[e]veryone knows everyone." Around noon on January 21, 2016, as Moreno was walking to her car in the parking lot behind the complex, she heard an argument between Aguilar (whom she knew as Titi) and Raul Espinoza (whom she knew as Bam). Espinoza, the complex manager's nephew, lived and worked in the complex. He also was defendant's good friend. From a distance of about 15 to 20 feet away, she saw Espinoza hit Aguilar, who fell to the ground. Espinoza then beat Aguilar, who did not fight back. Also present were Aguilar's girlfriend Jessica, defendant and his girlfriend Arlene Peraza, and Peraza's two children, who were playing in the parking lot.[4] Moreno saw defendant pacing back and forth watching the beating. Defendant was agitated and appeared to be trying to join the fight. When defendant pulled a black gun from under his pants, which he kept moving to his side and pointing near the area where Espinoza and Aguilar were, Jessica screamed, "[O]ne on one." No one else joined the fracas.

The disturbance ended when the manager came out saying she was calling the police. Moreno did not see where Espinoza

---

[4] Moreno identified a photograph of Peraza's car, which she described as a gray Honda. Moreno initially testified that the Honda was burgundy, but corrected herself, explaining that she had misremembered the color at first.

4

went from there. She did see Jessica and Aguilar leave through the gates toward Pioneer Boulevard and the front of the building. Moreno also walked toward the front, and defendant walked behind her.

Jessica testified that she and Aguilar had started dating in October 2015. She had known defendant in her former neighborhood on the other side of Norwalk where she lived until she was 14 years old. She had not seen him again after that until 2015, when she saw him in the Pioneer Boulevard complex where defendant lived in the apartment next door to Jessica's mother. Defendant was still living there on January 21, 2016. Jessica visited her mother several times per week where she saw defendant periodically. Once toward the end of September 2015, they discussed dating but she was not interested and declined, giving him various reasons.

Jessica testified that she had never seen Aguilar and Espinoza fight before January 21, 2016, but had seen them talking in the complex. She recalled seeing defendant, Peraza and her two boys there that day. Before the fight began she saw "Youngster," a 15- or 16-year-old boy, pull out and hand a silver gun to Espinoza, who fixed it, handed it back and told Youngster to hold it. She did not see anyone else with a gun. Jessica was about six feet away from the fight, and it appeared to her that Espinoza was winning. When she saw defendant he was about 15 to 17 feet away. When the fight ended Aguilar picked up the things he had dropped during the fight, and he and Jessica left the apartment complex, walking quickly toward Allard Street.

Later that day sheriff's deputies went to the house directly across the street from the Pioneer Boulevard apartment complex where they obtained surveillance footage of a view of the front of

5

the apartment complex, recorded between 12:04 and 12:11 p.m. on January 21, 2016. As the video was played for the jury Jessica identified defendant, Peraza and her two children, Youngster, and Peraza's silver car in the video. As Peraza and defendant emerge from the building Peraza points in one direction while saying something to defendant, who then runs in the opposite direction followed quickly by Youngster, a toddler on a tricycle and another toddler on foot. Peraza caught up to him before they were all out of view. Just before 12:11 p.m., a silver car is recorded traveling back toward the apartment complex in the direction that Peraza had been pointing. A few minutes after defendant, Youngster, Peraza and the boys disappeared from view, a man in a dark hoodie and long basketball shorts walks slowly on the sidewalk of Pioneer Boulevard across the street from the apartment complex.

Rodrigo Malagon testified that he was driving to school on January 21, 2016, and reached the intersection of Allard Street and Arlee Avenue between 12:10 and 12:15 p.m. Malagon saw a couple holding hands near the intersection. The woman was later identified as Jessica and the man as Aguilar. Malagon then saw a silver Honda approach from Pioneer Boulevard. The windows were up and Malagon could not see into the car, which stopped near the curb by a fire hydrant. With the motor running, the driver got out holding a silver pistol and quickly approached the couple, who appeared to know him and looked frightened. When the man with the pistol was about an arm's length away from the couple, he shot Aguilar, who fell on his back. Within about three seconds he turned and shot Jessica. She also fell to the ground. Malagon did not hear any of the three people speak. The shooter then jogged toward an alley at the end of the block,

6

came back toward the couple and shot Jessica again while she was on the ground. The shooter then walked back toward the silver car. Malagon, who was nervous, drove away and did not see the shooter get back into the silver car. He then called 911.

Malagon gave Detective Mark Christiansen a description of the shooter as five feet seven inches or five feet eight inches tall, weighing about 160 pounds, with short hair, but not bald, and wearing baggy pants. Malagon testified that the shooter was wearing a silver or gray long-sleeved shirt, possibly striped. When the prosecutor showed him a still photograph of the man in the video wearing a hoodie (exhibit 11), Malagon testified that the shooter had not been wearing a hoodie or a hat, and was not the person in the photograph. He did not see the man depicted in the photograph near the scene of the shooting. Malagon was about 30 feet away from the shooting, did not see the shooter's face, and could not identify anyone in court. In court Malagon estimated that defendant was about the same height and weight as the shooter.

Jessica testified that after the fight ended she and Aguilar walked away from the apartment complex toward Allard Street. As they walked Peraza's car approached and passed them, then stopped on the corner of Allard Street and Arlee Avenue. Defendant got out of the car, holding his waist. Jessica and Aguilar stopped, and Jessica told defendant, "[S]top. Just leave. [G]o away." Defendant then pulled out a silver gun and pointed it in their direction. It was the same gun that Espinoza and Youngster had handled before the fight earlier at the apartment complex. Jessica shouted louder, "Just no, don't," as defendant raised the gun and shot Aguilar in the face. Aguilar fell back and seconds later defendant turned the gun on her and shot her in

the neck from about 10 to 12 feet away. Jessica fell straight back and played dead, hoping he would go away. About 10 seconds later he shot her again. Defendant did not say anything when he shot her. Jessica then heard him run to the car, and she saw him get in on the driver's side.[5]

After Jessica heard the car door shut and the car move away, she ran to help Aguilar. She screamed for help and ran to the corner house where she banged on front door and screamed as loud as she could. Jessica tried to call 911 and her mother but could not remember whether she got through. When she ran back out the gate a woman approached to help her. A motorist, who stopped to help, saw that Jessica had trouble talking on her phone, so he told the person on the line that her daughter had been shot, and was at the corner of Allard Street and Arlee Avenue. Jessica's mother, Ida Smith, told the man that she would be there.

Smith testified that she was working near the intersection of Allard Street and Pioneer Boulevard on the day of the shooting when she answered a call sometime after 12:15 p.m. from Jessica's phone. Smith heard Jessica crying and calling out for help. When someone else got on the phone and said Jessica had been hit at Allard Street and Arlee Avenue, Smith rushed there but was prevented by a police officer from going directly to her daughter. Smith could see Jessica lying on the ground and called out to her, to which Jessica gave a thumb's up.

Smith followed the paramedics to the trauma center where Jessica was taken. Jessica remained in the hospital five days.

---

[5]     Jessica testified that she could hear Peraza in the car "laughing and cackling."

8

Aguilar died of a gunshot wound to the head. Jessica was scared, sad, and upset when she was told by staff that Aguilar had died. Jessica told her mother what had happened and told her that it was Fernando who had shot her and Aguilar. Smith knew Jessica was referring to defendant, whom she knew. She also knew that defendant and Jessica were friends, although not close.

Detective Dameron Peyton spoke with Jessica around 3:00 p.m. on January 23, the day that Jessica was moved to a private room. Jessica was still upset, in pain, medicated, nervous, and afraid. Both Smith and Jessica disliked Detective Peyton, and Jessica refused to be interviewed by him. Smith spoke to the detective briefly in the hall when he left, and neither the detective nor Smith recalled whether Smith told him that Jessica had identified defendant. Detective Peyton did not include that in his report, although he claimed he probably would have done so had Smith told him. Detective Peyton did not say when defendant became the suspect but testified that he had no information suggesting there was any other suspect.

Both Smith and Jessica remembered speaking to Detective Christiansen at the crime scene. Since Jessica wanted to speak to him, Smith contacted him on January 26. Detective Christiansen went to the hospital where he found Jessica sitting in bed in a lot of pain but coherent. Detective Christiansen testified that defendant was the only suspect. He brought three separate photo lineups to the hospital, each with six photographs, including one with defendant's photograph. When he showed Jessica the array with defendant's photograph in it, she immediately identified defendant as the shooter. Jessica also identified the photograph of Espinoza and Peraza in the two

9

other photographic lineups. Jessica told Detective Christiansen that defendant had been wearing long black basketball shorts and a black hoodie with the hood down.

During her direct examination when Jessica was shown exhibit 11, she testified that she did not see the man depicted in the photograph at Allard Street and Arlee Avenue when she was shot. She was then asked, "Did you see that man when you were shot?" She replied, "I said yes." When asked where she saw him, Jessica replied, "When he was driving, when he got out in the sidewalk and pointed the gun at us, is that when I saw him?" The prosecutor replied, "I'm asking you." Jessica was then asked what defendant had been wearing. Jessica testified that defendant had been wearing a black hoodie with the hood down and very long basketball shorts when he shot them. Later in direct examination, when Jessica was again shown exhibit 11, she testified that she did not know who the man in the photograph was. In her cross-examination Jessica testified that during the fight in the parking area defendant was wearing a black hoodie with the hood down off his head. Again she was shown exhibit 11 and testified that she did not know that person. Asked why she said yes after being asked that before, Jessica explained that she had been misunderstood.

Jessica admitted having smoked a "bowl" of marijuana the morning she was shot, explaining that a bowl was about the size of her thumbnail. She also had smoked "a few hits" of methamphetamine a couple days before the shooting. However she testified that when defendant shot her, she saw his face and had no doubt that it was defendant who killed Aguilar and shot her twice. She added that when defendant shot her he was about 10 feet away, close enough for her to see the tattoos of devil horns

on his head. Defendant had very little hair at the time of the shooting, so she could see the tattoos through his hair.

Jessica also testified to an incident that occurred the night before the shooting. She and Aguilar were sitting near a liquor store not far from the Pioneer Boulevard apartment complex, when defendant, Peraza and Youngster arrived in Peraza's car. Defendant was repeatedly doing "donuts" with the car while Peraza was in the passenger seat "cackling and laughing." Right after one of the donuts, Peraza looked at Jessica and said, "[B]itch." Jessica and Aguilar then walked back to the apartments. When they arrived, defendant and Peraza pulled up, defendant got out of the car and began arguing with Aguilar. Peraza then got out of the car, rushed to Jessica, who pranced around and away from her because she did not want to fight. Jessica and Peraza did physically fight, but not for long. The argument between Aguilar and defendant never became physical. Jessica and Aguilar then went upstairs to Aguilar's best friend's apartment. Jessica had no idea why Peraza attacked her and called her a bitch.

Jessica suffered lingering medical problems as a result of the shooting. She suffered nerve damage from the neck down her left arm and aggravation of some preexisting symptoms and anxieties. Jessica was nervous while testifying, and she explained that when she felt nervous she would get tense or fidgety, clench her hands a lot, and her jaw had a tendency to move.

Defendant's father, Fernando Flores, Sr., testified that shortly past 12:00 noon on January 21, 2016, the manager of the apartments came to his door and told him that his son had been shot at Allard Street and Arlee Avenue. He ran there, but an

11

officer stopped him from going to the scene. He returned home and saw defendant later that day at McDonald's.

**Defendant's testimony**

*Direct examination*

Defendant denied shooting Jessica and Aguilar. He denied that he ever asked Jessica for a date and claimed that they were just neighbors when he was 16 years old. Defendant had been in a relationship with Peraza since 2014, and they have a daughter together. Peraza's two boys were from a previous relationship. Defendant knew Espinoza as Bam Bam, the handyman for the apartments, whose aunt lived there, but denied they were friends. Defendant denied knowing Aguilar and ever having spoken to him or fought with him, although he now knew of him. Youngster was a neighbor, not someone defendant considered a friend. Defendant thought Youngster and Espinoza were friends.

Defendant denied doing "donuts" with the car the night before the shooting as Jessica had testified and claimed that he had been looking for a parking space. Defendant denied knowing why Jessica and Peraza got into a fight outside the apartment building.

Defendant admitted being present during the fight in the parking lot the day of the shooting, but claimed that he did not know what was going on, did not "really see" who was fighting, and it was none of his business. He knew his neighbor Moreno, who was Peraza's friend, not his, although he denied that there was any bad blood between him and Moreno. Defendant denied having held a gun or any weapon in the parking lot as she had testified.

After defendant viewed the surveillance video showing him, Peraza, her children, and Youngster coming out of the apartment

12

building shortly after 12:00 p.m., he claimed not to have known where Youngster was going. Defendant claimed that the reason he and Peraza left after the fight was to take the two boys to the Northgate Market to get something to eat. After defendant heard about the shooting and a discussion with his father, defendant decided to move. Sometime after that day he moved to a motel with Peraza and the children. He was arrested two and a half weeks later.

Defendant testified that he was five feet 11 inches tall and weighed 210 pounds, up from 190 pounds at the time of his arrest.[6]

### *Cross-examination*

Defendant testified that he had horn tattoos on his head, although his hair was now longer.

The surveillance video was again played, and defendant first claimed that he could not tell whether Peraza was pointing and could not remember what Peraza was telling him. Defendant then admitted that he could see in the video that her right arm was extended in the direction of Allard Street. Defendant agreed that the video showed him running in the opposite direction toward Imperial Highway where Peraza's car was parked, holding an article of clothing. He denied that he was holding a gun under a hoodie, rather he was holding a pair of blue pants. Defendant testified that he was going to Peraza's car, but he did not know why Youngster was running after him. Defendant

---

[6] Detective Peyton testified that defendant's booking report indicates defendant's height and weight as five feet 11 inches and 190 pounds. He also explained that booking reports reflect the heights and weights reported by the person arrest and are not based on measurements taken at the time of booking.

agreed that it was Peraza's car seen in the video on Pioneer Boulevard, headed toward Allard Street.

Defendant testified that he knew where the intersection of Allard Street and Arlee Avenue was, as he had lived in the apartment complex since May 2014, but he had never for any reason taken a turn on Allard Street toward Arlee Avenue and did "not really" do so on January 21, 2016. Defendant said that after he ran to the car he, Peraza, and the boys went to the Northgate Market in Pico Rivera.

Defendant testified that Peraza and the boys lived then with defendant and his parents. Moreno and Peraza were friends, and defendant had known Moreno since he was paroled in May 2014. Though they talked and hung out in the complex and defendant got along with her, he did not really talk to her. Defendant admitted being in the parking lot when Espinoza and Aguilar fought but claimed that he was not near the fight. When asked, "So when Melanie Moreno, with whom you seem to have a good relationship, comes to court and says that you were trying to jump in on the fight holding a gun, is she lying?" Defendant replied, "Yes." Defendant claimed that he was about 30 feet away from the fight, getting the boys, who had been riding their bikes in the parking lot, and Peraza was right behind him, also not close to the fight.

Defendant testified that he knew who Jessica was, having seen her and greeted her at the apartment complex about three times per week, when she visited her mother who lived next door to defendant. When he spoke with Detective Peyton he said he did not know Jessica "like that"—like being in a relationship, not that he did not know her. There was nothing between him and Jessica. Defendant knew she had a boyfriend and had seen

14

Aguilar around the building two or three times, but he did not know Aguilar or who he was. Defendant said he did not see Aguilar the day of the shooting, and the last time he had seen Aguilar in the complex was the night before. Defendant denied killing him. Defendant said he did not know Espinoza when he lived there, although he knew of him. He did know that Espinoza was related to the manager, worked in the complex, and wore a uniform.

Defendant knew about the shooting but not why he was being investigated for it. After moving out of the complex, between January 21 and the day of his arrest on February 10, 2016, defendant stayed at three different motels: one in Norwalk and two in Whittier, where he paid $400 per week. He moved to motels in order to save money and denied asking his parents to let him continue to live with them.

When asked about the donut-driving incident, defendant denied that Peraza taunted Jessica and that she called Jessica a bitch. At the time he was not going to the liquor store where he saw Jessica and Aguilar, but he had just had the car washed and was looking for a parking space around the apartment complex. He ended up parking in front of the apartment building and happened to see Jessica and Aguilar outside the complex. When he parked Peraza got out of the car and began arguing with Jessica. Defendant denied knowing what they argued about. He was busy getting the boys out of their car seats and did not hear what they were saying. The fight got physical and although defendant could not remember whether they used their fists, they did not end up on the ground. Asked why he did not go to her or try to stop the fight, knowing that Peraza was pregnant at the time, defendant replied that he wanted to get the children out of

15

the car.  When the prosecutor asked whether defendant had then argued with Aguilar, got in his face, or tried to pick a fight with him, defendant laughed and denied each question.  Defendant denied antagonizing, fighting or bullying Aguilar.  He denied having done anything that day to Aguilar.

## DISCUSSION

### I.  Exclusion of evidence

Defendant contends that the trial court improperly excluded evidence of Jessica's untreated bipolar disorder and the effects of methamphetamine on her ability to accurately perceive reality.  He argues that the trial court's ruling violated his federal constitutional rights to due process, a fair trial, to present a complete defense, and to confrontation.

Prior to jury selection the prosecution sought to exclude the testimony of Dr. Brand, a psychiatrist who had been retained to assess Jessica while she was in the hospital, under Evidence Code section 352.  The prosecutor offered to stipulate that Jessica had methamphetamine and marijuana in her system when she was taken to the hospital, but wanted to exclude any testimony by Dr. Brand regarding possible effects of methamphetamine if combined with mood stabilizers.  Defendant's counsel wanted to present testimony about the possible cognitive effect of methamphetamine on a person suffering from bipolar disorder in order to provide evidence of Jessica's demeanor at the time.

The trial court noted that in defendant's first trial Dr. Brand testified that he did not consider himself an expert in the field.  He could say that some people are affected cognitively and others are not, and although it is possible that Jessica was so affected, he could not give an opinion about any effect on her in

16

this case. Before ruling the court thought that the evidence would probably be excluded as more prejudicial than probative under Evidence Code section 352 but indicated it would look at the transcript of Dr. Brand's testimony before making a final decision.

Evidence Code section 352 provides that the trial "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (See *People v. Valdez* (2012) 55 Cal.4th 82, 138.) The trial court enjoys broad discretion in making its assessment, and its discretion will not be disturbed unless the defendant demonstrates that it was exercised "'in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124; see Cal. Const., art. VI, § 13; Evid. Code, §§ 352, 354.) The trial court's broad discretion extends to excluding evidence of the victim's drug use or intoxication. (*People v. Loker* (2008) 44 Cal.4th 691, 735-736.)

When the issue was revisited midtrial, the trial court observed that defense counsel had identified no evidence suggesting that since Jessica had bipolar disorder she had an altered sense of reality or was unable to recall and recollect. The court suggested that if the defense had evidence that a person with bipolar disorder, or a person who had ingested certain drugs, or a person with bipolar disorder who had ingested certain drugs, would in fact have an altered sense of reality, it would be admitted as impeachment. Otherwise, the court explained, the defense would need to present an expert opinion based on evidence linking Jessica's bipolar disorder to an inability to recall

17

and leading to misidentification of the defendant. Or the defense would need other expert evidence showing that not taking her prescribed medication for bipolar disorder would lead to hallucinations. If the defense did not do so, the testimony would be speculative and used only "to dirty her up to some extent without any kind of basis for it." As the defense had not identified any such evidence, the trial court excluded Dr. Brand's testimony as more prejudicial than probative.

The court is not required to admit evidence of the victim's drug use that merely makes her look bad. (*People v. Loker, supra*, 44 Cal.4th at p. 736, quoting *People v. Kelly* (1992) 1 Cal.4th 495, 523; *People v. Hillhouse* (2002) 27 Cal.4th 469, 496.)

"[T]he mental illness or emotional instability of a witness can be relevant on the issue of credibility, and a witness may be cross-examined on that subject, if such illness affects the witness's ability to perceive, recall or describe the events in question." (*People v. Gurule* (2002) 28 Cal.4th 557, 591-592.) However, the trial court may exclude evidence of mental illness without a showing that "it may affect her powers of perception, memory or recollection, or communication." (*People v. Herring* (1993) 20 Cal.App.4th 1066, 1072.) "'A person's credibility is not in question merely because he or she is receiving treatment for a mental health problem.'" (*People v. Anderson* (2001) 25 Cal.4th 543, 579.)

Defendant's offer of proof consisted entirely of Dr. Brand's testimony given in defendant's first trial. Defendant now contends that "Dr. Brand's testimony about Jessica's untreated bipolar disorder and his testimony about the cognitive effects of bipolar disorder, methamphetamine, and marijuana, was highly probative of Jessica's awareness, understanding and the ability to

18

recognize and comprehend at and around the time of the shooting." Defendant's argument is largely based upon exaggeration and mischaracterization of Dr. Brand's testimony. In fact, Dr. Brand's testimony was not probative of Jessica's awareness, understanding, or the ability to recognize and comprehend events and people on January 21, 2016, which is demonstrated by a summary of the relevant parts of his prior testimony.

Dr. Brand testified that he was the director of the psychiatry unit at St. Francis Medical Center where he saw Jessica on January 26, 2016, after the attending physician asked him to consult because she was a victim of trauma who had a history of bipolar disorder and drug use. Dr. Brand had no specific recollection of Jessica and relied on her chart and his consultation report. The chart indicated that Jessica had been taking Seroquel and Ativan but had not taken it for some months.[7]

When asked whether it was likely that a person with bipolar disorder who had recently taken methamphetamines and marijuana might hear something or see something that did not actually occur, Dr. Brand testified, "It's a possibility." Adding, "I can't really give a likelihood or percentage, but it's a possibility." However, he explained that he obtained a history, and she denied having hallucinations. He also documented that Jessica was not psychotic or out of touch with reality when he saw her.

---

[7] Dr. Brand explained that Ativan is a drug prescribed for anxiety, while Seroquel is generally prescribed for people with bipolar disorder, in order to stabilize mood swings and racing thoughts.

Dr. Brand was unable to give an opinion regarding Jessica's psychological cognitive status at the time that she was shot.

When asked whether it was possible for methamphetamine users to sometimes have perceptions of reality that are not accurate, Dr. Brand again replied that it was possible. He noted that he was not an expert in the science of methamphetamine, how long it lasted in the system, or how it affected the body. However, he thought that methamphetamine generally lasted in the user's system for two or three days with the effects reduced day by day during that time and that some patients were cognitively affected and some were not—it varied from patient to patient. It would also depend on how much of the drug was ingested, the person's state of mind and nutritional status at the time. Although Dr. Brand was unable to give an opinion as to whether Jessica's perception of reality was altered by the methamphetamine at the time she was shot, he said that generally people under the influence of methamphetamine are still able to recognize faces and voices, depending on how much they had used and when it was ingested.

Defendant argues that although Dr. Brand was subpoenaed as a percipient witness, he also was a qualified expert, and his testimony was necessary to educate the jury on the possible effects of methamphetamine and marijuana on a person with untreated bipolar disorder, particularly on the user's perception of reality. There was neither a ruling nor stipulation that Dr. Brand was an expert in the possible effects of methamphetamine and marijuana on a person with untreated bipolar disorder. Defendant merely cites Dr. Brand's testimony that he had been a psychiatrist for 30 years and was the medical director of the psychiatry unit at St. Francis Medical Center. In

fact Dr. Brand did not qualify as an expert on the possible effects of methamphetamine and marijuana on a person with untreated bipolar disorder. He himself testified that he was *not* an expert in the science of methamphetamine or how it affected the body.

Defendant also asserts that the defense made an offer of proof from Dr. Brand's prior testimony that it was possible that a person with Jessica's bipolar disorder, exacerbated by use of methamphetamine and marijuana, could have been hallucinating. Defendant's offer fails to show an ability to present evidence that *Jessica* may have been hallucinating. Dr. Brand's testimony was that there might possibly be some people in the population who might possibly experience hallucinations under such circumstances. Dr. Brand made clear that he was not giving an opinion regarding Jessica. As such, defendant failed to demonstrate that the inference concerning Jessica's state of mind on the day of the shooting was anything more than speculative; and "exclusion of evidence that produces only speculative inferences is not an abuse of discretion." (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.)

We reject defendant's suggestion that his offer of proof was comparable to the facts in an Oregon case, *State v. Gherasim* (1998) 153 Ore.App. 313, where the trial court excluded expert testimony that the sexual assault victim was affected by dissociative amnesia, a condition that impairs the ability to recall and recount events accurately. Instead Dr. Brand testified that he was unable to give an opinion regarding Jessica's psychological cognitive status at the time she was shot and that he was not an expert on the effects of methamphetamine or its effect on the body. Moreover, he testified that when he visited Jessica she was not psychotic or out of touch with reality. Thus

21

there was no proof that Jessica's ability to recall and recount events accurately was impaired.

Defendant argues that circumstantial evidence supported a finding that Jessica may have been experiencing auditory and visual hallucinations because defendant disputed the details of her testimony about a fight with Peraza the day before the shooting and Jessica's testimony that he was driving in donut formations while Peraza laughed. He claims this as evidence of hallucinating because he denied doing donuts and was merely searching for a parking space. Defendant also suggests that the conflict between Jessica's description of the shooter's clothing and Malagon's description provided evidence of hallucinating. Defendant fails to explain how Dr. Brand might have drawn a correlation between hallucination and conflicts in witnesses' recall or perception of events. We find defendant's argument speculative and unpersuasive.

"[E]xclusion of evidence that produces only speculative inferences is not an abuse of discretion." (*People v. Babbitt, supra*, 45 Cal.3d at pp. 684; see *id.* at pp. 681-682.) Defendant has failed to demonstrate that Dr. Brand's testimony would accomplish anything other than to mislead the jury into speculating that Jessica's perception and memory was impaired on January 21, 2016. As such we conclude that defendant has failed to demonstrate that the trial court's exercise of discretion was erroneous, much less arbitrary, capricious or patently absurd.

Moreover, to demonstrate an abuse of discretion under Evidence Code section 352, defendant must demonstrate not only that the ruling was erroneous but also that the error resulted in a miscarriage of justice. (*People v. Rodrigues, supra*, 8 Cal.4th at

p. 1124; see Cal. Const., art. VI, § 13; Evid. Code, §§ 352, 354.) Defendant was required to meet this burden under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836, which asks whether there was a reasonable probability of a different result absent the alleged error. A "'probability' . . . does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) Since defendant made no offer to prove Jessica's ability to recall and recount events accurately was impaired, allowing Dr. Brand's testimony could allow the jury to speculate that Jessica's perception and memory was impaired on January 21, 2016, without any basis. Thus any argument under the *Watson* standard fails for the very same reasons that defendant has failed to demonstrate error.

Defendant argues that the proffered testimony amounted to critical defense evidence, and its exclusion deprived him of a meaningful opportunity to present a complete defense and violated his constitutional rights to due process, a fair trial, and confrontation. He concludes that the applicable harmless error standard here is the test for prejudice due to federal constitutional error articulated in *Chapman v. California* (1967) 386 U.S. 18, which asks whether the error was harmless beyond a reasonable doubt. He describes the "critical defense evidence" as testimony by Dr. Brand that Jessica's untreated bipolar disorder in combination with methamphetamine and marijuana could cause a misperception of reality.

In fact defendant proffered no such critical defense evidence as we have concluded above. The trial court properly found that defendant's offer of proof included *no* evidence that Jessica's bipolar disorder meant that she had an altered sense of

23

reality or that she was not able to recall and recollect. Indeed, the trial court indicated to defense counsel that if he *had* proffered evidence to suggest that the use of certain drugs by a person with bipolar disorder would in fact cause an altered sense of reality, it would have been admitted as impeachment. Defendant proffered only speculation.

"'As a general matter, the "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense."'" (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203.) Under such a circumstance, defendant bears a heavy burden to demonstrate a violation of his right to due process under the Constitution. (*Montana v. Egelhoff* (1996) 518 U.S. 37, 42-43.) Defendant has not met this burden. Regardless, if we had found error we would find it harmless under any standard. We disagree with defendant's suggestion that the evidence was not overwhelming, as well as with his contention that this was a close case. Defendant primarily relies upon attacking Jessica's credibility, claiming her identification of him was unreliable. In particular, he places great emphasis on Jessica's confusion over exhibit 11, the photograph of the man on Pioneer Boulevard wearing a black hoodie and basketball shorts. Defendant also places emphasis on witnesses' differing recollections about the clothing worn by the shooter and defendant, as well as the difference between witnesses' estimates of defendant's height and weight and the height and weight claimed by defendant.

Contrary to defendant's arguments, when all pertinent evidence is considered along with inferences reasonably drawn from such evidence, the case against defendant was

24

overwhelming, without significant reliance on some conflicts in the witnesses' recall of certain details or in Jessica's testimony.

Compelling evidence suggested that defendant was angry with Aguilar the night before the shooting, when defendant argued with Aguilar and Peraza argued with Jessica. Moreno testified that she saw the fight between Aguilar and Espinoza, which occurred about noon the next day. She saw defendant pacing back and forth in an agitated manner, watching the fight and looking as though he wanted to join in; and she saw him pull out a gun, which he pointed toward the ground in the area where Espinoza and Aguilar were fighting. She testified that everyone knew everyone else in the complex, and she knew that defendant and Espinoza were good friends.

Once the fight ended Jessica and Aguilar walked together toward Allard Street. Soon thereafter a surveillance camera recorded Peraza and defendant emerge from the building; Peraza pointing toward Allard Street while saying something to defendant; defendant then running in the opposite direction to where defendant admitted Peraza's car was parked, followed quickly by Youngster, Peraza, and her two boys. The video then shows defendant holding something that appears to be wrapped in an article of dark clothing about the size of a hoodie. Just before 12:11 p.m., a silver car is seen on the video traveling toward Allard Street. Defendant admitted that he was the driver of the silver car in the video. The most reasonable inference to draw from the action is that defendant was going after Jessica and Aguilar, and possibly doing so while holding a weapon under the hoodie Jessica testified defendant had been wearing during the fight.

Just a few minutes later Malagon was stopped at the intersection of Allard Street and Arlee Avenue where he saw a couple holding hands and a silver car approaching from Pioneer Boulevard. He then saw that the car stopped, and with the motor running the driver got out holding a silver pistol. He approached the couple, who appeared to know him and looked frightened, at a fast pace. Malagon saw the man shoot Aguilar, then Jessica, and then shoot Jessica again. The shooter then returned to the silver car.

Jessica gave compelling testimony that she recognized defendant as the shooter, which was bolstered by Malagon's testimony that the shooter shot her once, started to jog away, and then returned to shoot her again. Defendant's actions give rise to an inference that after thinking about it he knew that Jessica would recognize him, and he did not want to leave her alive to identify him. Jessica also recognized the car as Peraza's and identified photographs of the car.

In sum the trial court did not err in excluding speculative, misleading evidence, and in the event it was error, we conclude beyond a reasonable doubt that the absence of such evidence was harmless.

## II. The certainty factor

Defendant contends that the trial court erred when it instructed the jurors with CALCRIM No. 315, which as read, suggests 14 factors to consider in determining how much weight to give eyewitness identification testimony. He argues that the

trial court should have excised the following factor: "How certain was the witness when he or she made an identification?"[8]

---

[8]     As read to the jury by the trial court, CALCRIM No. 315 instructs as follows:

"You've heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] If evaluation [*sic*] identification testimony, consider the following questions: [¶] Did the witness know or have contact with the defendant before the event? [¶] How well could the witness see the perpetrator? [¶] What were the circumstances affecting the witness' ability to observe, such as lighting, weather conditions, obstructions, distance and duration of observation? [¶] How closely was the witness paying attention? [¶] Was the witness under stress when he or she made the observation? [¶] Did the witness give a description and how does that description compare to the defendant? [¶] How much time passed between the event and the time when the witness identified the defendant? [¶] Was the witness asked to pick the perpetrator out of a group? [¶] Did the witness every [*sic*] fail to identify defendant? [¶] Did the witness ever change his or her mind about the identification? [¶] How certain was the witness when he or she made an identification? [¶] Are the witness and defendant of different races? [¶] Was the witness able to identify the defendant in a photographic or physical lineup? [¶] Were there any other circumstances affecting the witness' ability to make an accurate identification? [¶] The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the

27

After this matter was fully briefed, the California Supreme Court published its decision in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*).[9] We invited the parties to submit supplemental briefs addressing the issues raised by that case.

In *Lemcke* the high court held that under the circumstances presented there the defendant failed to establish error or a denial of due process. (*Lemcke, supra*, 11 Cal.5th at p. 669.) When considered as one of 15 factors the jury was instructed it could consider in evaluating identification testimony the certainty factor did not render the defendant's trial fundamentally unfair. (*Id.* at p. 646.) Nevertheless, the court noted the "general agreement [among researchers and the courts of several other jurisdictions] that witness certainty is not a good indicator of accuracy under most circumstances," and acknowledged that "the current version of the instruction might confuse jurors about the relationship between confidence and accuracy . . . ." (*Id.* at p. 666.) The court therefore exercised its supervisory powers by directing "trial courts to omit the certainty factor from CALCRIM No. 315 until the Judicial Council has the opportunity to consider how the language might be better worded to minimize juror confusion on this point." (*Id.* at p. 669.) The court clarified that

crime. If the People have not met this burden, you must find the defendant not guilty."

[9] The Supreme Court granted review in that case to consider whether "instructing a jury with CALCRIM No. 315, which directs the jury to consider an eyewitness's level of certainty when evaluating an identification, violate[s] a defendant's federal and state due process rights." (*Lemcke, supra*, 11 Cal.5th at pp. 653-654.)

"[t]rial courts, however, retain discretion to include the factor when the defendant requests that it do so." (*Ibid*.)

Defendant argues that this case is distinguishable from *Lemcke*, primarily because the defense in *Lemcke*, unlike here, presented the testimony of an eyewitness identification expert and the court read CALCRIM No. 332, which instructed the jury it must consider the expert's testimony. (*Lemcke, supra*, 11 Cal.5th at pp. 652, 657-658.)

Defendant acknowledges that he did not object to the instruction. Nor did he challenge the certainty factor. We agree with respondent that defendant has forfeited this issue by failing to object or to request a modification of the instruction in the trial court. (See *People v. Sánchez* (2016) 63 Cal.4th 411, 461 (*Sánchez*); *People v. Sullivan* (2007) 151 Cal.App.4th 524, 561.)

Defendant argues that his failure to object to the instruction should be excused as futile because the trial court would have been bound by prior California Supreme Court decisions approving the certainty factor. (See, e.g., *Sánchez, supra*, 63 Cal.4th at pp. 461-462; *People v. Johnson* (1992) 3 Cal.4th 1183, 1231-1232; *People v. Wright* (1988) 45 Cal.3d 1126, 1144.) Defendant does not identify precisely what the trial court would have been bound to do prior to the publication of *Lemcke*. In fact the record discloses no indication that the trial court would have refused a legally correct, nonargumentative alternative instruction or modification, and there is nothing in *Sánchez, Johnson,* or *Wright* that would have precluded the trial court from granting such a request. Indeed in *Wright* the court held that the trial court erred in refusing the defendant's proposed alternative instruction on eyewitness identification, but found the error harmless. (*Wright, supra*, at p. 1144.) "If

defendant had wanted the court to modify the instruction, he should have requested it. The trial court has no sua sponte duty to do so." (*Sánchez, supra*, a p. 461.) Defendant has thus forfeited the issue.

Defendant asks that if this issue is deemed forfeited, we find a denial of effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. (See *Strickland v. Washington* (1984) 466 U.S. 668, 686.) Unless and until defendant has shown prejudice by demonstrating a reasonable probability of a different result upon reversal, we need not reach any claim of ineffective assistance due to counsel error. (*Id.* at p. 687; see *People v. Holt* (1997) 15 Cal.4th 619, 703.)

Defendant has not met his burden to show prejudice. First defendant has not demonstrated that the instruction was erroneous. As respondent observes defendant concedes that the Supreme Court did not overrule its prior approval of the use of the certainty factor. (*Lemcke, supra*, 11 Cal.5th at p. 656, quoting *Sánchez, supra*, 63 Cal.4th at p. 461.) In particular, the court did not overrule prior decisions holding that the certainty factor does not instruct the jury that certainty equals accuracy. (*Lemcke, supra*, at p. 647.) Instead the *Lemcke* court acknowledged that the factor has the *potential* to mislead jurors. (*Id.* at p. 665.)

Next defendant has not demonstrated that the potential to mislead was a reasonably likely occurrence here. Fourteen factors in CALCRIM No. 315 were read to the jury. Thus there were 13 factors besides certainty for the jury to consider, which defendant does not challenge as misleading, confusing, or flawed,

including the final factor, "any other circumstances affecting the witness' ability to make an accurate identification." When the certainty factor is considered along with the entire instruction, that single factor is unlikely to result in a denial of due process. (*Lemcke, supra*, 11 Cal.5th at p. 646.)

As defendant points out the *Lemcke* court's decision that the defendant failed to establish a violation of due process was based on the circumstances of that case considered in the context of that entire record as a whole. (*Lemcke, supra*, 11 Cal.5th at pp. 646-647.) *Lemcke* held that the certainty factor must be viewed in the context of the entire instruction and charge to determine whether it resulted in such fundamental unfairness as to deprive a defendant of his due process rights. (*Ibid.*) Having done that here, we come to the conclusion that defendant was not deprived of his due process rights.

Jurors are presumed to have understood and correctly applied the trial court's instructions unless there is evidence of confusion or the jury requested further guidance on the issue at hand. (*People v. Gonzales* (2011) 51 Cal.4th 894, 940.) CALCRIM No. 315 concluded: "The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty." Prior to reading CALCRIM No. 315, the trial court read CALCRIM No. 226, which included factors to consider in evaluating the accuracy of witness testimony, including those emphasized by the prosecutor in closing argument when she urged the jury to consider how well Jessica could see, hear, and perceive, as two people can perceive the same event in different ways. She added that the jurors should also consider where the witnesses were, whether they

were they focused, what they were doing, and what was happening to them. The prosecutor did not refer to Jessica's "no doubt" testimony and did not use the word "certainty," or any form or any synonym for it in relation to Jessica's identification of defendant as the shooter. The jury was thus not encouraged to give any more weight to the certainty factor than to any of the other 13 factors. We find no indication in the record that the jury was confused or misled.

Defendant points out that in *Lemcke*, the Supreme Court recognized that "[t]he large body of research conducted in this area has identified numerous factors that can affect the correlation between witness certainty and accuracy including . . . (2) the temporal proximity between the event and the identification; . . . and (6) information witnesses receive after the identification that might increase their level of confidence." (*Lemcke, supra*, 11 Cal.5th at p. 667.) Defendant argues that evidence of these two *Lemcke* factors showed there was no correlation between Jessica's confidence and accuracy.

We disagree. Defendant cites factor No. 2, "the temporal proximity between the event and the identification," and suggests that Jessica's identification was flawed because it was not "immediate," as she did not make the identification to the police for five days after the shooting. Defendant does however acknowledge that Jessica's mother testified that Jessica told her after just two days that the shooter was defendant. Also during some or all of that time, Jessica was in a coma, intubated, and sedated. In essence, Jessica's identification was immediate.

Defendant also cites factor No. 6, "information witnesses receive after the identification that might increase their level of confidence." Defendant argues that it is possible that

information received by Jessica from her mother after her identification tainted an initially uncertain identification. Defendant fails to show that Jessica's initial identification of a person she had known for years, made to her mother who also knew defendant, was uncertain.

Moreover defendant has not shown that the jury was at all swayed at all by Jessica's claim of certainty, and we reject the suggestion in defendant's arguments that the proof of the accuracy of Jessica's identification was based entirely or almost entirely on her claim of certainty. The first factor in CALCRIM No. 315 asked, "Did the witness know or have contact with the defendant before the event?" Jessica explained that she had no doubt that the shooter was defendant among other reasons, because she had known defendant for years, had seen him many times including earlier that very day, recognized his car when he stopped and emerged with a gun, and she recognized his horn tattoos. It was thus unlikely that the jury relied solely upon Jessica's claim of certainty without considering the evidence of her reasons for certainty.

We explained in our harmless error analysis in part I above, the evidence of defendant's guilt provided by Jessica, other witnesses, and the surveillance video was overwhelming. As in *Lemcke*, when the single, short certainty factor is viewed in the context of this entire instruction and record, the circumstances mitigate against a finding of fundamental unfairness that deprived defendant of his due process rights or lessened the prosecutor's burden of proof. (See *Lemcke, supra*, 11 Cal.5th at pp. 646-647.)

Finally given the overwhelming evidence of defendant's guilt, if the certainty factor had been excised and Jessica had

never testified that she had "no doubt" it was defendant who killed Aguilar and shot her twice, we are satisfied that there would remain no reasonable likelihood of any different outcome. Defendant thus has no claim of ineffective assistance of counsel for failing to request a modification of CALCRIM No. 315, and the issue is forfeited.

## III.  Alleged prosecutorial misconduct

Defendant contends that the prosecutor engaged in misconduct in two areas of her summation, which denied him a fair trial and due process of law, requiring reversal.

"'A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact.' [Citation.]  'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' [Citation.]  'When attacking the prosecutor's remarks to the jury, the defendant must show' that in the context of the whole argument and the instructions there was "'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner."'" (*People v. Rangel* (2016) 62 Cal.4th 1192, 1219.)

### A.    *The use of the word "fight" for "argument"*

Defendant asserts that the first area of misconduct resulted from stating that defendant was "fighting" with Aguilar, when making reference to Jessica's testimony regarding the argument between defendant and Aguilar the day before the shooting.

34

Defendant argues that the word "fight" necessarily means a *physical* fight, and since there was evidence only of a verbal *argument* between the two men, it was misconduct. The prosecutor stated:

> "We know in this case that [defendant] seemed to be sort of a bully. That fight the day before, that during his testimony he tried to exclude himself out of it to try to say, no, I was getting my kids and it was only [Peraza] and Jessica who were fighting. We know from Jessica's testimony that he was fighting with [Aguilar] and that Jessica and [Peraza] were fighting. [¶] [H]e in fact was bugging [Aguilar]. He in fact was fighting with him. You decide that."

Defendant suggests that the prosecutor's use of the word "fight" rather than "verbal argument" was a deliberate misrepresentation intended to support a motive theory that the prosecutor had repeatedly attempted to present with hearsay evidence.

Defense counsel did not object in a timely fashion or on the same ground asserted here and made no assignment of misconduct. Counsel did not ask for an admonishment or a clarification of the prosecutor's choice of words. Indeed, counsel did not object or mention it at all. Defendant claims that the issue was preserved when defense counsel objected twice to the prosecutor's "attempts to introduce inadmissible hearsay evidence about a fight Jessica heard about between [Aguilar] and [defendant]," and then later asked that the testimony be stricken and for a mistrial. However, as respondent points out, that was a different line of questioning. The hearsay issue involved a different fight that Jessica had heard about. A short time after defense counsel's objections were sustained, the prosecutor turned to Jessica's fight with Peraza the night before the

35

shooting, and the simultaneous verbal argument between defendant and Aguilar that Jessica witnessed.  There was no objection to this line of questioning.

A "defendant's failure to raise an objection to a prosecutor's remarks and to request a curative instruction forfeits the objection."  (*People v. Williams* (2016) 1 Cal.5th 1166, 1188.)  Furthermore, an appropriate curative instruction would have been as easy to find as the nearest dictionary.  The word "fight" is commonly used to mean a verbal disagreement or argument.  (Merriam-Webster's Online Dict. (2021) <https://www.merriam-webster.com/dictionary/fight> [as of Oct. 27, 2021], archived at <https://perma.cc/G482-RMEL>.)

Defendant contends that the issue should be reached due to the ineffectiveness of counsel for failing to object.  Citing *People v. Yeoman* (2003) 31 Cal.4th 93, 149, defendant points out that it is improper to invite the jury to speculate.  He contends that the prosecutor improperly invited the jury to speculate that defendant was physically fighting with Aguilar, when she ended the challenged passage with, "[H]e in fact was bugging [Aguilar].  He in fact was fighting with him.  You decide that."  Defendant concludes that defense counsel was ineffective for failing to object, because there can be no strategic reason for not objecting to such an argument.

Defendant has mischaracterized the prosecutor's argument by means of a strategic placement of ellipses and the omission of nearly the entire paragraph ending with, "You decide that."  While a prosecutor should not invite the jury to speculate, it is proper to ask the jury to draw reasonable inferences from the evidence. (*People v. Yeoman, supra*, 31 Cal.4th at p. 149.)  That is what the prosecutor did.  Any objection based on speculation

would have been futile, and thus counsel was not ineffective. (See *People v. Anderson, supra*, 25 Cal.4th at p. 587.)

We conclude that defendant has failed to preserve his challenge to the prosecutor's word choices. Moreover, defendant has not shown that the jury misinterpreted "fight" to mean a physical fight. Jessica testified that the argument between Aguilar and defendant was a verbal argument, which never became physical. The trial court instructed the jury with CALCRIM No. 222 as follows: "In opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence." "It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions." (*People v. Gonzales, supra*, 51 Cal.4th at p. 940.) As the record reflects no confusion on the part of the jury or requests for further guidance with regard to the meaning of the word "fight," we do not assume they were misled by the prosecutor's argument. (Cf. *id.* at pp. 939-940.)

**B.** *Jessica's alleged delay in identifying defendant*

In the second challenged area of argument, defendant contends that the judgment should be reversed because the prosecutor engaged in misconduct in final argument by comparing Jessica's alleged delay in identifying defendant while she was in the hospital, to the reluctance of sexual assault victims to report their attackers. Bypassing the trial court's rulings with regard to this issue defendant directly challenges the prosecutor's remarks. As defendant does not claim that the trial court abused its discretion with regard to this contention, we reject it.

37

Defense counsel argued at length during summation regarding Jessica's refusal to speak to Detective Peyton and her alleged delay in identifying defendant during her hospital stay. In rebuttal, the prosecutor reminded the jury that Jessica had been intubated, and she argued that common sense would indicate that talking might be uncomfortable. The prosecutor went on to explain why a victim might be reluctant to identify her assailant. She argued: "You might not be in the best of moods to talk. And, yes, she didn't care for Peyton. . . . She was afraid, but she was safe in the hospital. [¶] Remember, she stayed there about five days, which is the 26th is when she gets released to go back home. Maybe to those apartments. And she discloses to her mom who the shooter is, and now she wants police to know who the shooter is because she's going to be out of that hospital. No longer safe. Going back to that neighborhood, the defendant's neighborhood."

Right after the above-quoted paragraph, the prosecutor began the challenged argument as follows: "Unless you take it outside this particular case—I thought immediately of children who have been molested before. Do they disclose right away every single time? No. Years go by. Sometimes because the pervert, the person lives right with them. Sometimes because they're too afraid to talk. Sometimes because they don't have that strength to disclose. Or maybe because they don't know who to trust. They don't feel ready to tell."

Defense counsel did not object, and the prosecutor continued: "Does it mean that it didn't happen to them? Does it mean that that child didn't get molested because they disclosed seven years later or 10 years later? The woman who discloses the rape. Does it mean that it's not true? Because that's what

38

counsel is basically saying, because she took too long to disclose, then it must not be true."

Still, there was no objection. The prosecutor's next sentence was, "Let me think of it. Let's go ahead and use common sense, because you don't check out your common sense out the door." Defense counsel then objected and said, "Improper argument." Counsel clarified, "The rapist and child perverts." Without ruling, the trial court told the prosecutor to move on.

After the prosecutor had completed the remainder of her summation, defense counsel moved for a mistrial on another issue, and the trial court, not defendant, brought up the issue of the prosecutor's delay argument and defendant's objection. The trial court found that the objection was untimely as the prosecutor had completed her argument on that point, but it agreed that the argument was improper, "a very, very bad comparison [to] compare a late reporting victim of a child molest to the defendant's conduct." The court also found that the prosecutor had argued matters not in the record. The court deferred the issue until after instructions in order to undertake some research.

After the instructions and before deliberations began, the trial court proposed the following admonition:

> "Earlier during closing argument there was an argument made explaining why a child victim may not immediately report his or herself molestation to the authorities. You are instructed that there has been no evidence as to why a child victim may or may not report such an incident and what circumstances may surround that failure to report. That comparison is not relevant to this case and you are instructed to disregard that argument completely and not let it enter into your deliberations in any way.

39

You're reminded that what the attorneys say is not evidence."

Defense counsel then again moved for a mistrial and requested that in case of a denial, the phrase, "Earlier during closing argument," be changed to "Earlier during the district attorney's closing argument." The trial court found the proposed instruction to be curative, denied the mistrial motion, and gave the instruction with the requested modification. Defense counsel made no assignment of misconduct, and the trial court did not specifically rule on that issue.

Defendant does not contend that the trial court's curative instruction was error or that the court abused its discretion in denying the motion for mistrial. In essence, defendant's appeal is taken from the alleged prosecutorial misconduct, not the court's rulings, which amounts to a suggestion that we should review the misconduct issue de novo. "As a general matter, an appellate court reviews a trial court's ruling on prosecutorial misconduct for abuse of discretion." (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.) A mistrial "should be granted only when a party's chances of receiving a fair trial have been irreparably damaged." (*People v. Ayala* (2000) 23 Cal.4th 225, 283.) And the trial court has "'considerable discretion' to determine whether . . . the error can be cured through admonishment or instruction." (*People v. Perez* (2018) 4 Cal.5th 421, 459.) "'Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Dunn* (2012) 205 Cal.App.4th 1086, 1094.)

Defendant attacks curative instructions in general with dicta in a federal appeals court and a United States Supreme Court concurring opinion. (*U.S. v. Garza* (5th Cir. 1979) 608 F.2d 659, 666 [""'if you throw a skunk into the jury box, you can't instruct the jury not to smell it"'"]; *Krulewitch v. United States* (1949) 336 U.S. 440, 453 (conc. opn. of Jackson, J.) ["naive assumption that prejudicial effects can be overcome by instructions . . . , all practicing lawyers know to be unmitigated fiction"].) Defendant asks, in essence, that we presume that no instruction can cure the prejudicial effect of any prosecutor's remarks. However, error is never presumed. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Thus, it is defendant's burden to demonstrate that the curative instruction was ineffective.

""'[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."'" (*People v. Ayala, supra*, 23 Cal.4th at p. 284.) Defendant instead focuses on the prejudice that may have resulted from the alleged prosecutorial misconduct without regard to the possible effectiveness of the curative instruction given here. Defendant incorporates his prejudice argument addressed in part I, above, in which he argued that the evidence against him was not overwhelming, that there were conflicts in the witnesses' recall, that some testimony was contradicted by other witnesses, and that some of Jessica's and Moreno's testimony should not be believed by this court. We have already rejected his claim that the evidence was not overwhelming in response to defendant's prejudice argument in part I. As evidence of defendant's guilt

was in fact overwhelming, and as defendant does not contend that the trial court's denial of the mistrial or its curative instruction was an arbitrary, capricious or patently absurd exercise of discretion that resulted in a miscarriage of justice, we reject defendant's misconduct challenge to the prosecutor's remarks regarding victims' fear of their attackers.

## IV. No cumulative prejudice

Defendant contends that if the prejudice caused by the errors alleged in this appeal do not require reversal, then the cumulative prejudice of all the alleged errors requires reversal. As we have rejected on the merits all of defendant's claims of error there can be no cumulative prejudicial effect. (See *People v. Sapp* (2003) 31 Cal.4th 240, 316.) Moreover, our harmless error analysis *ante*, would apply equally to any of defendant's asserted errors if they had been well taken. Thus, even considering them together, there is no cumulative effect that might warrant reversal of the judgment. (See *People v. Henriquez* (2017) 4 Cal.5th 1, 48.)

## DISPOSITION

The judgment is affirmed.

_____
CHAVEZ, J.

We concur:

_____          _____
LUI, P. J.                                      HOFFSTADT, J.